Edgcomb Law Group
JOHN D. EDGCOMB (SBN 112275)
MARY E. WILKE (SBN 216723)
115 Sansome Street, Suite 700
San Francisco, CA 94104
Telephone: (415) 399-1555
Facsimile: (415) 399-1885
jedgcomb@edgcomb-law.com

Bingham McCutchen LLP
NANCY M. WILMS (SBN 111837)
JILL C. TERAOKA (SBN 155800)
355 South Grand Avenue, Suite 4400
Los Angeles, CA 90071-3106
Telephone: (213) 680-6400
Facsimile: (213) 680-6499
nancy.wilms@bingham.com
jill.teraoka@bingham.com

Attorneys for Defendant/Counterplaintiff
MCKESSON CORPORATION and
Defendants/Counterclaimants/Cross-Claimants
HARVEY SORKIN, SEYMOUR MOSLIN,
AND THE ESTATE OF PAUL MASLIN

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| ANGELES CHEMICAL COMPANY, INC., a California Corporation, GREVE FINANCIAL SERVICES, INC., a California Corporation, and JOHN G. LOCKE, an individual,<br><br>        Plaintiffs,<br><br>        v.<br><br>MCKESSON CORPORATION, a California Corporation, et al.,<br><br>        Defendants. | CASE NO. CV 01-10532 TJH (Ex)<br><br>MCKESSON'S OPPOSITION TO PLAINTIFFS' MOTION FOR DISQUALIFICATION OF DR. ROUHANI, MR. HALL AND NEWFIELDS<br><br>Date: April 21, 2008<br>Time: TBD<br>Courtroom: 17<br>Judge: Hon. Terry J. Hatter, Jr.<br><br>Discovery Cutoff: June 11, 2007<br>Pre-Trial Conference: June 23, 2008<br>Trial Date: TBD |

1  | MCKESSON CORPORATION, a
   | Delaware Corporation,
2  |
   |              Counterplaintiff,
3  |
   |      v.
4  |
   | ANGELES CHEMICAL COMPANY,
5  | INC., a California Corporation, et al.,
6  |              Counterdefendants.
7  | AND RELATED CROSS-CLAIMS

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# TABLE OF CONTENTS

Page

I.   INTRODUCTION AND SUMMARY OF ARGUMENT..............................1

   A.   Plaintiffs' Claimed "Fruit of the Poisonous Tree" Per Se Disqualification Rule Has Been Rejected ..............................1

   B.   Plaintiffs Cannot Satisfy the Controlling Paul Test. ...................2

   C.   Granting the Motion Would Be Extremely Prejudicial ......................3

II.   STATEMENT OF FACTS ....................................................3

   A.   Plaintiffs Never Established A Confidential Relationship With DBSA Lab or Dr. Stephens ......................................4

   B.   The Information Exchanged Between Shaw and DBSA Labs Was Strictly Technical and Non-Confidential ..........................5

      1.   DTSC Required Plaintiffs To Collect and Submit the Test Data Contained in the DBSA Lab Report..........................5

      2.   The Documents Provided By Shaw to DBSA Lab Contain Solely Contract/Technical Information......................6

   C.   Plaintiffs Waived Any Confidentiality Claim. ............................7

   D.   Prior to October 2004, DBSA Entered Non-Confidential Data Into Geosyntec Database ..............................................7

      1.   DBSA Entered Non-Confidential Data into The Geosyntec Database ................................................7

      2.   McKesson Confirms DBSA Did Not Add Confidential Information to The Database ..................................8

   E.   NewFields Incorporated Only Non-Confidential Data Into Its Own Database......................................................8

   F.   The Limited Scope of DBSA Disqualification Order........................9

   G.   Plaintiffs Waived Any Confidentiality Applicable To DBSA Lab's Services Or The Entries In The Database ................................10

      1.   The Court Grants McKesson's Motion to Compel Shaw Documents re: Shaw Report ....................................10

      2.   Plaintiffs Also Waived Any Confidentiality By Designating Dr. Everett As A Testifying Expert......................11

      3.   Dr. Everett's Reliance On The Geosyntec Database Also Waived Any Confidentiality ...................................12

III.   PLAINTIFFS CANNOT SATISFY THE LEGAL REQUIREMENTS FOR DISQUALIFYING NEWFIELDS ..........................................12

   A.   Plaintiffs' "Fruit of the Poisonous Tree" Per Se Rule for Expert Disqualification Has No Basis In Law...............................12

   B.   Plaintiffs Cannot Satisfy Their Burden Because They Never Disclosed, and NewFields Does Not Possess, Confidential Information ....................................................15

i

## TABLE OF CONTENTS
(continued)

Page

1.  Plaintiffs Never Reasonably Believed They Had a Confidential Relationship with DBSA/NewFields ..................17

2.  Shaw Never Passed "Confidential" Information to DBSA Lab..................................................................................17

3.  Plaintiffs Repeatedly Waived Any Confidentiality Over All Information Shaw Gave To DBSA Lab.............................18

4.  DBSA Lab Knowledge Is Not Imputed To Dr. Stephens........19

5.  DBSA's Disqualification Did Not Bar McKesson From Using Geosyntec Database Updated by DBSA as "Poisonous Fruit." ......................................................................20

6.  Plaintiffs' Speculation Is Inadequate to Support Motion; McKesson Has Proven That NewFields Does Not Possess Confidential Information ...........................................21

C.  The Balance Of Equities Strongly Favors Denial. ...........................22

1.  Plaintiffs Not Prejudiced By NewFields' Use of the Database ..............................................................................22

2.  Disqualification of NewFields Would Irreparably Prejudice McKesson ................................................................23

3.  Plaintiffs Purposefully Delayed In Bringing The Motion To Irreparably Prejudice McKesson .......................................25

ii

# TABLE OF AUTHORITIES

Cases

Page

Actel Corp. v. Quicklogic Corp.,
1996 WL 297045 (N.D. Cal. May 29, 1996).................................14

Advanced Cardiovascular Sys. v. Medtronic, Inc.,
1998 WL 230981 at *2 (N.D. Cal. Feb. 27, 1998) ............................18

Arnold v. Cargill Inc., 2004 WL 2713259 (D. Minn. Nov. 23, 2004) ...............14, 15

Baghdady v. Baghdady,
2007 WL 3432427 (D. Conn. Nov. 15, 2007) ...................................13

Chamberlain Group v. Interlogix, Inc.,
2002 WL 653893 (N.D. Ill. April 19, 2002)............................ passim

Coates v. Duffer's Golf Center,
2007 WL 1289890 (D. Mass. May 2, 2007) ....................................22

Endrody v. M/Y Anomaly,
2005 WL 2207007 (W.D. Wash. Sept. 9, 2005) ................................22

First Wisconsin Mortgage Trust v. First Wisconsin Corp., 584 F.2d 201
(7th Cir. 1987) ...........................................................14, 15

Grant Thornton, LLP v. FDIC,
297 F. Supp. 2d 880 (S.D. W. Va. 2004) ....................................1, 13

Greene, Tweed of Delaware, Inc. v. DuPont Dow Elastomers, LLC,
202 F.R.D. 426 (E.D. Penn. 2001)...........................................22

Harvey v. Jones,
2006 WL 1889314 (W.D. Wash. July 7, 2006) ................................22

Hewlett-Packard Co. v. EMC Corp.,
330 F. Supp. 2d 1087 (N.D. Cal. 2004)......................... 1, 13, 16, 19

Hewlett-Packard Co. v. EMC Corp., 330 F. Supp. 2d 1087 (N.D. Cal.
2004) .....................................................................15

In re Syncor ERISA Litigation,
229 F.R.D. 636 (C.D. Cal. 2005)............................................4

Lone Star Indust., Inc. v. Southern Red-e-Mix, Inc., 1995 WL 775348
(D. Kan. Dec. 18, 2005) ..................................................15, 21

Malden Mills Ind., Inc. v. Commerce Indus. Ins. Co.,
275 B.R. 670 (D. Mass 2002)..............................................17, 23

North Pacifica, LLC v. City of Pacifica,
335 F. Supp. 2d 1045 (N.D. Cal. 2004).....................................13

Paul v. Rawlings Sporting Goods Co.,
123 F.R.D. 271 (S.D. Ohio 1988)........................................1, 15, 21

OPPOSITION TO MOTION FOR DISQUALIFICATION OF EXPERTS NANCY BICE AND GEOSYNTEC

TABLE OF AUTHORITIES
(continued)

Page

Rico v. Mitsubishi Motors Corp.,
    42 Cal. 4th 807 (2007).........................................................13

Stencel v. Fairchild Corp.,
    174 F. Supp. 2d 1080 (C.D. Cal. 2001) ................................ 15, 16, 19

Twin City Fire Ins. Co., Inc. v. Mitsubishi Motors Credit of America,
    2006 WL 5164249 (C.D. Cal. Nov. 6, 2006)............................. passim

United States v. Bergonzi,
    216 F.R.D. 487 (N.D. Cal. 2003)...........................................4


Statutes

Fed. R. Civ. P. 26(a)(2)............................................................11

Fed. R. Civ. P. 37(c) ..............................................................23

Rule 26(a)(2)(B) ........................................................... 12, 19, 23


Other Authorities

Expert Witnesses in Civ. Trial § 2:3 (2d. ed. 2006)................................13

iv

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# I.   INTRODUCTION AND SUMMARY OF ARGUMENT

"[D]isqualification is a drastic measure that courts should impose only hesitantly, reluctantly, and rarely." *Hewlett-Packard Co. v. EMC Corp.*, 330 F. Supp. 2d 1087, 1092 (N.D. Cal. 2004). "This is so, in part, because *sometimes disqualification motions are brought for purely strategic reasons. . . . A party moving for disqualification bears a 'heavy standard of proof'* to show that disqualification is warranted." *Grant Thornton, LLP v. FDIC*, 297 F. Supp. 2d 880, 882 (S.D. W. Va. 2004) (emphasis added).

Plaintiffs' motion to disqualify Dr. Rouhani, Mr. Hall and Mr. Finley of NewFields, LLC, and NewFields Companies LLC (collectively, "NewFields"), McKesson's primary technical experts, is just such a "strategic" motion. Plaintiffs' provably false or unsubstantiated claims of wrongdoing by McKesson and NewFields fail to meet their "heavy standard of proof." The total absence of any prejudice to plaintiffs caused by NewField's use of non-confidential data in a database that plaintiffs have used to their benefit, contrasted with the extreme, irreversible prejudice that McKesson would suffer if this tardy motion were granted at this late stage, affirms that only one just outcome is possible—**denial**.

## A.   Plaintiffs' Claimed "Fruit of the Poisonous Tree" Per Se Disqualification RuleHas Been Rejected.

To disqualify NewFields, case law requires plaintiffs to prove, among other things, that: 1) they had an objectively confidential relationship with NewFields; 2) NewFields possesses confidential information belonging to plaintiffs; and 3) significant resulting prejudice to plaintiffs. *Paul v. Rawlings Sporting Goods Co.*, 123 F.R.D. 271 (S.D. Ohio 1988); *Stencil v. Fairchild Corp.*, 174 F. Supp. 2d 1080, 1083 (C. D. Cal. 2000)(*see* Section III, *supra*.) Unable to meet this test for disqualifying an expert (the "*Paul* test"), plaintiffs ask this Court to substitute an absurdlybroad "fruit of the poisonous tree" rule providing that if an expert possess *any* information, confidential or not, originating from a previously disqualified

1

1    expert, that expert too must be disqualified for possessing *"per se"* tainted

2    information.  But plaintiffs cite no federal court cases applying such a *"per se"* rule.

3    There are none.   There are, however, attorney disqualification cases where courts

4    have squarely rejected the *per se* "fruit of the poisonous tree" rule and instead allow

5    the use of work product untainted by the receipt of any confidential information ,

6    consistent with the controlling *Paul* test.

7         **B.    Plaintiffs Cannot Satisfy the Controlling *Paul* Test.**

8              Plaintiffs plainly cannot meet ***any*** of the elements of the *Paul* test with

9    respect to NewFields.  Plaintiffs admit they had no "confidential" relationship with

10   NewFields.    Moreover, based on an all the relevant evidence, it is now clear

11   plaintiffs never had such a relationship with Daniel B. Stephens & Associates

12   ("DBSA") either. [1]  (*See* Section II.A-B, *infra*.)  Thus, plaintiffs fail the first part of

13   the relevant test. Next, none of the data contained in the database used by NewFields

14   and contested  by plaintiffs is "confidential" to plaintiffs because *none* was originally

15   provided by plaintiffs to DBSA in the context of a prior confidential consulting

16   relationship[2]; it all came from non-confidential reports generated by McKesson and

17   plaintiffs.  The fact that now-disqualified expert DBSA input or corrected some of

18   this non-confidential data in that database is of no legal consequence.  (*See* Section

19   _____

20   [1] Dr. Daniel Stephens of DBSA was the McKesson expert consultant disqualified by
     this Court in a 2004 Order and is the source of plaintiffs' alleged "poisonous fruit."

21   Plaintiffs alleged in that earlier motion that its consultant, Shaw Environmental and
     Infrastructure Inc. ("Shaw") established a confidential consulting relationship with

22   DBSA by requesting the DBSA Hydrologic Testing Laboratory ("DBSA Lab") to
     conduct routine physical testing on 12 soil samples from the Angeles property.  This

23   allegation was implicitly accepted by the Court in its Order disqualifying Dr.
     Stephens and DBSA from providing further expert consulting services to McKesson.

24   However, it is now clear from deposition testimony and documents produced by
     plaintiffs after that 2004 Order, along with new case law, that plaintiffs' allegation

25   was false.  McKesson recently filed a Motion for Reconsideration of the Court's
     Order. (*See* McKesson's Request for Judicial Notice ("RJN") ¶ 18.)

26   [2] It is also clear that ***none*** of the information provided by Shaw to the DBSA Lab in
     2003 or the resulting lab report prepared by the DBSA Lab was "confidential" when

27   the Court disqualified DBSA in October 2004.  Plaintiffs voluntarily and repeatedly
     disclosed this information to McKesson and the public, which this Court held was a

28   complete waiver of confidentiality. *See* Section II.G.1; *infra*; *see also* RJN at ¶ 10.

MCKESSON'S OPPOSITION TO PLAINTIFFS' MOTION FOR DISQUALIFICATION OF NEWFIELDS

A/72487987.1/0335440-0000317287

1   III, *infra*.)  Moreover, plaintiffs gave the same database to their expert, Lorne Everett,

2   formerly employed by Shaw and now by Haley & Aldrich ("H&A"), waiving any

3   confidentiality claim. Courts have squarely held that disqualification cannot be based

4   on information given to a testifying expert. (*See* Section III.B.3, *infra*.)  Thus,

5   plaintiffs also fail the second part of the *Paul* test.  Finally, plaintiffs fail to

6   demonstrate *any* prejudice suffered by them as a result of NewFields' use of a

7   database containing solely non-confidential data.  Indeed, plaintiffs have **benefited**

8   from their own testifying expert's possession and use of that same database. (*See*

9   Section III.C, *infra*).  As a result, plaintiffs also fail the third part of the *Paul* test.

10   Failing to meet their heavy burden, plaintiffs' motion fails.

11         **C.**    **Granting the Motion Would Be Extremely Prejudicial**

12         The Court should deny the motion because it lacks any equitable

13   justification and is grossly unfair to McKesson.  The disqualification at this late stage

14   of the litigation of McKesson's primary technical experts, who have disclosed six

15   expert reports among them, would be extremely prejudicial to McKesson, effectively

16   depriving it of the ability to defend itself in this action.  Plaintiffs' improper tactical

17   delay in waiting to bring this motion until the eve of the parties' disclosure of rebuttal

18   reports magnifies the prejudice to McKesson.

19   **II.**    **STATEMENT OF FACTS**

20         To prevail, plaintiffs must prove a chain of alleged facts, including that

21   their testifying expert, Dr. Everett of Shaw, gave plaintiffs' confidential information

22   to DBSA Lab, who gave that information to Dr. Dan Stephens of DBSA, who gave

23   that information to Geosyntec, who gave that information to NewFields. (*See* Section

24   III.B, *infra*).  McKesson proves below that none of this occurred and that plaintiffs

25   waived any alleged confidentiality in any case by submitting it with Shaw's February

26   2004 "Summary Site Characterization Report" ("Shaw Report") to the Department of

27

28

1    Toxic Substances Control ("DTSC") in satisfaction of DTSC's long-standing demand

2    for a just such a report. (*Id*.)[3] Moreover, plaintiffs filed the documents containing the

3    allegedly confidential information as a matter of public record as Exhibits F, G and I

4    to the Declaration of Jeffrey Caufield on July 29, 2004. (RJN ¶ 1 at 5:22-6:17.)

### A.   Plaintiffs Never Established A Confidential Relationship With DBSA Lab or Dr. Stephens.

Plaintiffs had no basis for objectively believing that their consultant Shaw's

request to DBSA Labs to perform physical soil tests on 12 samples from the Angeles

property created a confidential expert consulting relationship with DBSA Lab or

DBSA generally. (RJN at ¶ 7 at 40:11-42:26, 45:10-47:12.) Shaw provided just 6

pages of documents to DBSA Labs. (Declaration of John Edgcomb filed concurrently

herewith ("Edgcomb Decl.") at ¶ 3, Ex. 1.) Nothing in these pages told DBSA Lab

that the work concerned litigation or that DBSA Lab was to prepare an "expert

report" or offer expert testimony. (*Id*.) The only party reference was a listing of

Angeles Chemical, no address, as Shaw's "project name" on one document and

"client" on another. (*Id*.) In short, DBSA Lab was retained by Shaw solely to

perform a technical service to generate objective site data.

Neither Shaw nor plaintiffs had any contact with Dr. Stephens or his litigation

support group within DBSA. (RJN, ¶ 3 at 4:6-20, 5:5-14.) Dr. Stephens' group

operated independently of DBSA Lab. Dr. Stephens had no knowledge of DBSA

Lab's test work for Shaw until the DBSA Lab Report was made public as Appendix

C to the February 2004Shaw Report. (Id. at 3:6-13, 5:5-14.) DBSA Lab employees

did no work for McKesson account and had no involvement with the database. (*See*

RJN ¶ 5 at 1:14-23.)

---

[3] Numerous courts have recognized that documents disclosed, or intended to be disclosed, to the government are not privileged or otherwise protected from disclosure. *See, e.g., In re Syncor ERISA Litigation*, 229 F.R.D. 636, 645 (C.D. Cal. 2005); *United States v. Bergonzi*, 216 F.R.D. 487, 494 n.8 (N.D. Cal. 2003).

**B.    The Information Exchanged Between Shaw and DBSA Labs Was Strictly Technical and Non-Confidential.**

1.    DTSC Required Plaintiffs To Collect and Submit the Test Data Contained in the DBSA Lab Report.

Both the 1993 Imminent and Substantial Endangerment Order ("ISEO") issued by DTSC against Angeles and the 2001 Response Action Agreement ("RAA") that Greve entered into with DTSC required the preparation of site investigation summary reports. (Edgcomb Decl. ¶ 8, Ex. 5 and ¶ 9, Ex. 6.)  Both documents referenced USEPA guidance documents regarding how to perform remedial investigations and recommended performance of physical soil tests.  (*Id*. ¶ 7, Exs. 3 and 4.)  Moreover, in 1992, McKesson consultant Harding Lawson & Associates ("HLA") physically tested soil samples and reported those test results in its 1992 Remedial Investigation ("RI") report to DTSC, just as Shaw reported the DBSA test results to DTSC in 2004.  (*Id*. ¶ 10, Ex. 7.)

Greve owner Joe Kennedy has admitted that the Shaw Report "was intended to satisfy" the DTSC's requirement for a remedial investigation report (Edgcomb Decl., ¶ 55, Ex. 28 at 23:14-22, 28:9-17), as has Greve's Project Manager, Hiram Garcia (*id.* ¶ 56, Ex. 29 at 255-58) and DTSC's Project Manager and two DTSC geologists.  (*Id.*, ¶ 57, Ex.31 at 242:21-243:11; Ex.32 at 399:16-402:19; and Ex. 33 at 259:22-261:7).  DTSC had long requested such a site summary report, exchanging internal mails and external demands.  (RJN, ¶ 7 at 36:20-38:7).

These undisputed facts establish that the physical soil tests DBSA Lab performed for Shaw were standard site investigation activities required by DTSC, not part of a confidential litigation strategy.  Just as McKesson was required to submit HLA's physical soil test data in its RI report to DTSC, plaintiffs were required to report the DBSA Lab Report data to DTSC in the Shaw Report.  Thus, there is nothing "confidential" whatsoever about either Shaw's request for testing or the data

1   reported in the DBSA Lab Report.[4]

2   2.      The Documents Provided By Shaw to DBSA Lab Contain Solely
            Contract/Technical Information.

3

4           Plaintiffs fail to identify *any* specific confidential information that Shaw

5   *allegedly* gave to DBSA Lab.  (*See* Mot. at 3:8-12.)  In his July 2004 declaration,

    plaintiffs' counsel identified that information as follows:  after Angeles retained
6
    Shaw, Shaw transmitted confidential information to DBSA Lab in a January 13, 2003
7
    Procurement Requisition (RJN ¶ 1 at 5:22-26)consisting of the "location of wells,
8
    well depths of importance, depths of soil samples, types of tests to be performed,
9
    standards to be used and a definitive scope of work to be followed regarding
10
    specialized tests to be performed." (*Id*. at 2:17-20, 5:22-28).   Shaw later faxed to
11
    DBSA Lab a Purchase Order and Scope of Work on January 23, 2003, requesting
12
    "certain highly confidential and specialized tests." (*Id*. at 6:11-17).  It is pure fantasy
13
    to claim this information is "confidential."  DTSC required this work be performed
14
    and reported to it, just as McKesson had done before.  Furthermore, the documents
15
    Shaw gave to DBSA Lab procuring the test work lacks any explicit instruction of
16
    "confidentiality."  (Edgcomb Decl. at ¶ 3, Ex. 1).    Plaintiffs misleadingly claim that
17
    the information in those few pages somehow "*indicated* [Angeles'] trial strategy"
18
    (RJN ¶ 1 at 2:21-25), but do not claim they or Shaw *actually* disclosed *any* trial
19
    strategy or attorney work product to DBSA Lab, and a review of these documents
20
    reveals they did not. (Edgcomb Decl. at ¶ 3, Ex. 1.)
21

22

23
    _____

24  [4] Plaintiffs claim the Shaw Report was Dr. Everett's Rule 26 expert report, but
    documents produced from Dr. Everett's files in 2007-08 as part of plaintiffs' expert
25  witness disclosures rebut this claim, since they show Dr. Everett did not begin
    drafting his expert opinion report until *March 30, 2004 -- after* the February 2004
26  Shaw Report had been submitted to the DTSC.  (Edgcomb Decl. ¶¶ 33-35, 42-46
    and Exs. 16, 24-26.)  Deposition testimony from multiple knowledgeable witnesses
27  affirms that the Shaw Report was not an expert report, but a summary technical
    report prepared to satisfy a DTSC requirement for exactly such a report. (Edgcomb
28  Decl., ¶¶ 55-57, Exs. 25-27.)

A/72487987.1/0335440-0000317287

**C.     Plaintiffs Waived Any Confidentiality Claim.**

Even if any confidential information were given to DBSA Lab, it was waived by plaintiffs' subsequent submission of the Shaw Report, including the DBSA Lab Report as Appendix C, to DTSC in February 2004. (Edgcomb Decl. at ¶ 5, Ex. 2.) The Shaw Report became a non-confidential document that any person could view on request to DTSC, including all the sampling-related information plaintiffs claim was confidential. (*Id.*).

**D.     Prior to October 2004, DBSA Entered Non-Confidential Data Into Geosyntec Database**

1.     DBSA Entered Non-Confidential Data into The Geosyntec Database

When McKesson retained Dr. Daniel Stephens in October 2003, it provided him with the database prepared by McKesson's existing (Geosyntec) and prior (Geomatrix) environmental consultants containing various types of data from the McKesson and Angeles sites ("Geosyntec database"). (RJN ¶ 2 at 1:14-26.) Prior to October 2004, Dr. Stephens' team conducted a quality assurance/quality control ("QA/QC") check of the Geosyntec database by comparing its data with that in the technical reports  previously produced by plaintiffs and McKesson. (*Id.* at 1:27-2:6.) This QA/QC check on Geosyntec's data entry required no special expertise. (*Id.*) When DBSA found a data entry error, the correction was made and noted. (*See* Declaration of Mike Wild filed concurrently herewith ("Wild Decl.") ¶ 37).[5] Dr.

---

[5] Plaintiffs' excerpts from the Geosyntec database confirm that DBSA performed "quality assurance" corrections of data. (Mot. at 11:13-23, 16:13-22.) The "Water Levels Table" and "Locations Table" contain columns for the "dbsa_qa" (i.e., DBSA quality assurance) and cites the "dbsa_source" (i.e., the non-confidential source document) in which the correct data was found. (*Id.* at 11:13-23; *see also* Caufield Decl., Exs. 20 and 21) (printouts of these tables). In the "dbsa_notes" column, the reviewer described the correction made, such as a changed well depth ("Changed wl_depth"), added well coordinates ("Coordinates Added"), or other additions of data. (Mot. at 11:13-23; *see also* Wild Decl. ¶ 37 (describing DBSA modifications to database)). These entries were all factual and do not contain opinion entered by DBSA (e.g., an assessment of the causes of the contamination). *See* Caufield Decl., Exs. 20 and 21.

1    Stephens' team also updated the database by inputting any new reported data.[6]  The

2    Geosyntec database, however, contains no data or information from the DBSA Lab

3    Report.  (RJN ¶ 2 at 2:7-16; Edgcomb Decl. at ¶ 22).

4        2.    McKesson Confirms DBSA Did Not Add Confidential
             Information to The Database

5            At McKesson's request, two consultants reviewed the Geosyntec

6    database to determine whether it contains plaintiffs' confidential information.

7    Geosyntec's Nancy Bice concluded  DBSA merely edited the database with data

8    obtained from identifiable public or otherwise non-confidential sources.  (RJN ¶ 2 at

9    1:14-2:16).  NewField's Mike Wild also concluded that "all DBS&A information can

10   be found from reports available to all parties in this matter, namely monitoring and

11   remedial investigation reports" and identified the source materials for each of the

12   database excerpts cited in the motion (Wild Decl. ¶ 37.) [7]

13       **E.    NewFields Incorporated Only Non-Confidential Data
             Into Its Own Database.**

14           NewFields, including Mike Wild, was retained by McKesson in January

15

16   2006.  (Wild Decl. ¶ 23.  Mr. Wild's first task was to incorporate the data from the

17   Geosyntec database into a new database that conformed to NewFields' system.  (Id. ¶

18   25).  Mr. Wild also performed a QA/QC check of the Geosyntec database, correcting

19   various errors and ambiguities in the data.  Id. ¶ 26.  He did not incorporate the DBSA

20   notations columns in the Geosyntec database into the notations NewFields database

21

22   [6] While DBSA was checking/updating the database, McKesson and Dr. Stephens
     were unaware Shaw had submitted soil samples for physical testing to DBSA Lab.
23   (RJN ¶ 3 at 3:19-23 and 4:6-13; RJN ¶ 4 at 3:15-21).
     [7] That Dr. Stephen's team added data, not expert opinion, is not in genuine dispute.
24   After examining the database, plaintiffs' expert, Dr. James Wells, testified that the
     database contains "hundreds of separate entries of *data* by DB Stephens &
25   Associates."  Wells Decl. ¶ 2 (emphasis added).  Though the specific sources for
     DBSA's data modifications are listed in the database (*see, e.g.*, Mot. at 11:13-23), Dr.
26   Wells does not suggest either that these regulatory reports or the data obtained
     contained therein are confidential.  Plaintiffs' attorneys, who also examined that
27   database, have also acknowledged that DBSA's role was to "add[] and modif[y]
     specific data points" to the database.  RJN ¶ 6 at 6:8-9.  Plaintiffs have never
28   contended any of those "data points" constitute plaintiffs' confidential information.

1  "because they were neither pertinent nor relevant and did not contain useful

2  information." (Id. ¶ 36.) NewFields also added new data as it became available in

3  regulatory reports or other public sources. (Id. ¶ 30.)[8]

4         Plaintiffs observe that Dr. Rouhani and Mr. Hall "rely upon" materials

5  prepared by Geosyntec but also acknowledge these materials are *publicly available*

6  regulatory reports and deposition transcripts taken by *plaintiffs' own attorneys* in this

7  case. (*See, e.g.,* Mot. at 12:21-13:3, 18:16-28 (citing reports)). Nothing in these

8  reports or depositions is even arguably confidential. These are exactly the kind of

9  factual materials a technical expert would consult in order to opine about the lithology

10  and contamination at issue. In fact, plaintiffs' *own* experts rely on these same

11  documents and depositions in the Shaw Report.

12      **F.**    **The Limited Scope of DBSA Disqualification Order**

13         On July 29, 2004, plaintiffs moved to disqualify DBSA based on

14  numerous false representations that Angeles had a confidential relationship with

15  DBSA and provided confidential information to it. (RJN ¶ 7 at 28:9-19, 32:4-10).

16  However, plaintiffs *did not* request the Court to prohibit McKesson or Geosyntec

17  from using the database or any other non-confidential materials prepared by DBSA;

18  asking the Court only to "prevent Dr. Stephens from acting as an expert to McKesson

19  in this case and disqualify Dr. Stephens accordingly." (*Id.* at 6:5-7.) On October 6,

20  2004, the Court granted the motion. (RJN ¶ 8.) The Court **did not order** McKesson

21

22  [8] Plaintiffs falsely claim that Mr. Wild "purged files" in response to plaintiffs' motion
to disqualify Geosyntec. (Mot. at 22:17-23:19.) In fact, Mr. Wild asked his project

23  team to delete the then-existing version of the NewFields database because he had
just been told he would be receiving new data from plaintiffs in their Updated

24  Remedial Investigation and he wanted to ensure that the entire team was working
with the same updated NewFields database. (Wild Decl. ¶ 55-56). Once his staff

25  affirmed that plaintiffs' new data had been entered accurately (taking  approximately
one month), Mr. Wild logged the changes in his "Project Corrections Log" and

26  circulated the updated database to the team. (*Id.* ¶ 58). Mr. Wild documented all
changes to the NewFields database in the Project Corrections Log or in the

27  "Comments" section of the database, both of which have been produced to plaintiffs.
(*Id.* ¶ 28) Plaintiffs identify no alleged confidential information added, utilized or

28  deleted in that database.

1    to destroy or quarantine any non-confidential materials that DBSA created or

2    contributed to, such as the updated Geosyntec database. Thus, McKesson had no

3    reason to believe it could not continue to use the non-confidential Geosyntec database

4    as corrected and updated by DBSA. (*See* Section III.A, *infra*.) McKesson and

5    Geosyntec complied with the October 6, 2004 Order. (RJN ¶¶ 5 at 1:5-13, 2 at 2:17-

6    22.) McKesson did not ask DBSA to perform any further expert opinion services

7    thereafter. (Edgcomb Decl. ¶ 52.)

8        **G.**      **Plaintiffs Waived Any Confidentiality Applicable To**
               **DBSA Lab's Services Or The Entries In The Database**

9

10      1.     The Court Grants McKesson's Motion to Compel Shaw
            Documents re: Shaw Report.

11           On or about February 24, 2006, McKesson served Shaw with a subpoena

12    seeking, in part, all documents that "refer or relate to" the Shaw Report or on which

13    plaintiffs relied "in preparing and/or assembling" the report ("Subpoena"). (Edgcomb

14    Decl., ¶ 47,Ex. 27 at 2). The Subpoena encompassed the services DBSA Lab

15    performed for Shaw, which became part of, and therefore "refer[red] or relate[d] to,"

16    the Shaw Report itself.[9] (*Id.*) Plaintiffs and Shaw refused to produce the Shaw

17    documents subpoenaed, claiming they were protected from discovery under FRCP

18    Rule 26 as "expert work product" and by a mediation confidentiality agreement. (*Id.*,

19    ¶ 48.) McKesson moved to compel. (RJN ¶ 9 at 17:16-24:22, 29:22-30:8.)

20    McKesson argued all information relating to or underlying the Shaw Report was

21    discoverable because it was never confidential or because plaintiffs waived

22    confidentiality by voluntary disclosing it. (<u>Id.</u> at 24:23-32:9).

23           On July 6, 2006, Judge Eick granted McKesson's motion on the grounds

24    that plaintiffs had waived, or never established in the first place, any privilege

25    ────────────────

26    [9] Plaintiffs acknowledge that DBSA Lab's services were used to support the
     assertions in the Shaw Report. Shaw and Dr. Everett "relied heavily on the results

27    from the DB Stephens report to verify and substantiate their findings regarding the
     Angeles site, and attached the DB Stephens report to the Shaw Report . . . ." RJN ¶

28    7 at 18:22-23.

1    applicable to the Shaw Report. (RJN ¶ 10).[10]  Judge Eick necessarily rejected

2    plaintiffs' claims that the Shaw documents were protected from discovery as "expert

3    work product" or by the mediation confidentiality agreement. Subsequently, Shaw

4    produced to McKesson the same documents that plaintiffs claimed contained

5    "confidential" information requiring the disqualification of Dr. Stephens as

6    McKesson's expert.  Judge Eick's Order makes it absolutely clear that *no documents*

7    *or information* in DBSA's possession are plaintiffs' "confidential" information, since

8    plaintiffs waived any such confidentiality.

9        2.    Plaintiffs Also Waived Any Confidentiality By Designating Dr.
10               Everett As A Testifying Expert

11           On August 15, 2007, plaintiffs identified Dr. Everett as a testifying

expert in this action. (Edgcomb Decl., ¶ 16, Ex. 9.) FRCP 26(a)(2)(B) permits
12
discovery of all information that a testifying expert received or relied upon in
13
rendering the expert's opinions.  "[L]itigants should no longer be able to argue that
14
materials furnished to their [testifying] experts to be used in forming their opinions . .
15
. are privileged or otherwise protected from disclosure . . . ." Fed. R. Civ. P. 26(a)(2)
16
Adv. Comm. notes (1993).  Plaintiffs claim that they disclosed confidential
17
information to Dr. Everett and Shaw, plaintiffs' "primary testifying expert[s]," and
18
that Dr. Everett and Shaw thereafter relayed that information to the DBSA Lab.  (*See*
19
RJN ¶ 7 at 3:12-14; 9:13-21; RJN ¶ 1 at 2:17-25.)[11]  Plaintiffs also admit that Dr.
20
Everett "relied heavily" on the DBSA Lab Report in formulating his expert opinions.
21

22   [10] On October 2, 2006, this Court denied plaintiffs' motion for review of the July 6
23   Order and the Ninth Circuit Court of Appeal denied plaintiffs' writ petition on
     January 23, 2007.  RJN ¶¶ 11 and 12.
24   [11]  In the current motion, plaintiffs state that "*Angeles and* its other expert Shaw
     communicated" confidential information to DBSA Lab.  Mot. at 3:9 (emphasis
25   added).  But in their 2004 motion to disqualify DBSA, plaintiffs' counsel swore
     under oath that "*Shaw gave DB Stephens*" this allegedly confidential information.
26   RJN ¶ 1 at 2:17-20 (emphasis added).  Moreover, the documents that allegedly
     contain the information were faxed to DBSA from Shaw or list Shaw as the client.
27   See id., Exs. F and I.  Finally, no confidential information supposedly
     communicated by Angeles to DBSA Lab is actually identified in the motion
28   rendering this unsupported conclusory statement meaningless.

1  (RJN ¶ 1 at 18:22-23.)  Under Rule 26(a)(2)(B), plaintiffs waived any assertion of

2  confidentiality over information given to or relied upon by Dr. Everett.

3      3.    Dr. Everett's Reliance On The Geosyntec Database Also Waived
            Any Confidentiality

4

5          Plaintiffs gave the Geosyntec database to Dr. Everett on November 28,

6  2006.  (Edgcomb Decl. ¶ 36, Ex. 18.)  Three months later, Dr. Everett's staff used that

7  database to "extract samples" for use and input into the database Haley & Aldrich

8  used to prepare both plaintiffs' 2007 Remedial Investigation report (H&A RI) and Dr.

9  Everett's August 2007 expert report (which incorporated the H&A RI by reference).

10  (*Id.* at ¶ 37, Ex. 19 and ¶ 39, Ex. 21.)  Pursuant to both Rule 26(a)(2)(B) and the

11  October 9, 2008 Stipulation re Timing and Scope of Expert Discovery ("Expert

12  Stipulation") (Edgcomb Decl., ¶ 41, Ex. 22) McKesson was entitled to discovery of

13  any material Dr. Everett relied on in preparing his expert opinions.  Plaintiffs initially

14  failed to produce the Geosyntec database to McKesson in violation of the Expert

15  Stipulation.  However, after McKesson's demand, plaintiffs produced it.  (Edgcomb

16  Decl., ¶ 41, Ex.23).  Plaintiffs thereby also waived any claim of confidentiality over

17  the database by giving it to their expert, who used it to plaintiffs' benefit.

**III.    PLAINTIFFS CANNOT SATISFY THE LEGAL
18         REQUIREMENTS FOR DISQUALIFYING NEWFIELDS**

19      **A.    Plaintiffs' "Fruit of the Poisonous Tree" Per Se Rule for
                Expert Disqualification Has No Basis In Law.**

20

21          Plaintiffs urge that the Court apply a rule of their own making; they

22  argue that NewFields must be disqualified merely because it relied in part on the

23  Geosyntec database (as updated by DBSA) and on publicly filed regulatory reports

24  prepared by Geosyntec.  (*See* Mot. at 12:5-13:3, 18:4-19:19.)  Under plaintiffs'

25  proposed rule, if an expert is disqualified, there is a *per se* taint to all work product of

26  that expert and any other consultant making use of it (in this case, a ***non-confidential***

27  database and public reports) must also be disqualified.  Plaintiffs' ***only*** cited legal

28  support for this "rule", however, is the general proposition that a district court has

1  broad discretion to exclude testimony of witnesses whose use at trial is in bad faith or

2  would unfairly prejudice an opposing party.  (Mot. at 7.)  This authority is

3  inapplicable here.

4     ***No federal court has applied this per se "taint" rule in an expert***

5  ***disqualification case.***  Instead, federal courts throughout California and from coast to

6  coast apply the *Paul* test,[12] which requires the moving party to prove that it had an

7  objectively confidential relationship with, and gave confidential information to the

8  opposing expert.  The *Paul* test allows a party to retain its expert even if the expert

9  previously had extensive contact with the opposing side, so long as the contact did not

10  involve the exchange of confidential information during a confidential relationship.

11  The *Paul* test does not permit mere disqualification by association.  Indeed, federal

12  courts have expressly rejected plaintiffs' sweeping *per se* taint rule in the analogous

13  context of a motion to disqualify an *attorney*, a context in which disqualification is

14  typically more readily granted.  *See, e.g., Cherry Hill Convalescent Ctr., supra,* 994

15  F. Supp. at 249.[13]  In *First Wisconsin Mortg. Trust v. First Wisconsin Corp.,* 584 F.2d

16  201, 211 (7th Cir. 1978)(*en banc*), the court evaluated whether a disqualified

17  attorney's work product had to be quarantined and held where there was no indication

18  _____

19  [12]  *See, e.g., In re JDS Uniphase Corp. Securities Litig.,* 2006 WL 2845212 (N.D. Cal.
Sept. 29, 2006) at *3; *Hewlett-Packard Co., supra,* 330 F. Supp. 2d at 1092-93;

20  *Crenshaw v. Mony Life Ins. Co.,* 318 F. Supp. 2d 1015, 1026 (S.D. Cal. 2004); *North
Pacifica, LLC v. City of Pacifica,* 335 F. Supp. 2d 1045, 1051 (N.D. Cal. 2004); *Twin
City Fire Ins. Co., Inc. v. Mitsubishi Motors Credit of America,* 2006 WL 5164249 at

21  *2 (C.D. Cal. Nov. 6, 2006); *Thane Int'l, Inc. v. Trek Bicycle Corp.,* 2004 WL

22  1146587, at *3 (C.D. Cal. May 12, 2004); *Stencel, supra,* 174 F. Supp. at 1083;
*Chamberlain Group v. Interlogix, Inc.,* 2002 WL 653893 at *2 (N.D. Ill. April 19,

23  2002); *United States ex rel. Cherry Hill Convalescent Ctr., Inc.,* 994 F. Supp. 244,
249 (D. N.J. 1997); *Baghdady v. Baghdady,* 2007 WL 3432427 at *1 (D. Conn. Nov.

24  15, 2007); *see also* Expert Witnesses in Civ. Trial § 2:3 (2d. ed. 2006) (describing
*Paul* as the "seminal" disqualification case).

25  [13]  For this reason, plaintiffs' citation to two attorney disqualification cases for the
relevant disqualification standard is in error. (*See* Mot. at 8:5-15).  Those cases apply

26  a different standard than is at issue in the motion at hand.  The decision in *Rico v.
Mitsubishi Motors Corp.,* 42 Cal. 4th 807 (2007) is inapt for the additional reason that

27  it was decided under California law.  Federal courts apply *federal* law to resolve
expert disqualification cases. (*See, supra,* n. 12.  *See also Grant Thornton, LLP,* 297

28  F. Supp. 2d at 884 (denying motion in expert disqualification case on federal law)).

1    of improper advantage, such as the use of confidential information obtained from the

2    opposing party, it would be ***an abuse of the district court's discretion*** to apply such

3    an "inflexible rule" and preclude its further use.[14]  (*Id.*)  The *First Wisconsin* court

4    faced facts very similar to here.  *Id.* at 207.  *First Wisconsin* supports the proposition

5    here that further use of the non-confidential data in the Geosyntec database by

6    Geosyntec and NewFields was proper.  *First Wisconsin* was adopted in *Actel Corp. v.*

7    *QuickLogic Corp.*, 1996 WL 297045 (N.D. Cal. May 29, 1996).  The *Actel* court

8    allowed a disqualified law firm to turn over its entire file to successor counsel, even

9    though an attorney with the disqualified firm had previously worked as a clerk for a

10   firm representing the opposing party and had read the case file while there.  Actel, at

11   *1.  The *Actel* court allowed this, in part, because "QuickLogic ha[d] made no

12   showing of special damage as a result of use of any confidential information."  Actel,

13   at *12.[15]  Plaintiffs here are unable to demonstrate *any* "special damage" caused to

14   them by McKesson's use of the *non-confidential* Geosyntec database.

15        In these attorney disqualification cases, federal courts have "decline[d]

16   to apply the principle which . . . urges that if there is a disqualification there is a *per se*

17   taint denying the use of work product during the period of disqualification."  *Actel,*

18   *supra*, at *12 (quotations omitted); *see also Arnold v. Cargill Inc.*, 2004 WL 2713259

19   at *3 (D. Minn. Nov. 23, 2004).  These courts instead require *the moving party* to

20   particularly identify any confidential information the opposing party possesses and

21   reject the use of "conjecture about the potential for confidential information to be

22   exploited."  *Lone Star Indust., Inc. v. Southern Red-e-Mix, Inc.*, 1995 WL 775348 (D.

23

24   _____

25   [14] *See also,* Chronicle *Pub. Co. v. Hantzis*, 902 F.2d 1028 (1st Cir. 1990); *Behunin v.*
     *Dow Chemical Co.*, 642 F. Supp. 870 (1986); *Equal Employment Opportunity*
26   *Comm'n v. Orson H. Gygi Co., Inc.*, 749 F.2d 620 (10th Cir. 1984); *Black v. Missouri*,
     492 F. Supp. 848, 861 (D. Mo. 1980).
27

28   [15] From Magistrate's proposed Order attached to the *Actel* Court's Order.

1  Kan. Dec. 18, 2005).[16] Thus, these courts reject plaintiffs' proposed rule that applies

2  a *per se* taint to all materials prepared by a disqualified attorney. A moving party

3  seeking to prevent use of such materials must prove *those materials* are confidential.

**B.     Plaintiffs Cannot Satisfy Their Burden Because They Never Disclosed, and NewFields Does Not Possess, Confidential Information**

6          "[D]isqualification is a drastic measure that courts should impose only

7  hesitantly, reluctantly, and rarely." *Hewlett-Packard Co.*, *supra*, 330 F. Supp. 2d at

8  1092; *see also Owen v. Wangerin*, 985 F. 2d 312, 317 (7th Cir. 1993). "Courts are

9  generally reluctant to disqualify expert witnesses, especially those…who possess

10  useful specialized knowledge." *Palmer v. Ozbek*, 144 F.R.D. 66,67 (D. Md. 1992);

11  *Great Lakes Dredge & Dock Co. v. Harnifscheger Corp.,* 734 F. Supp. 334, 339 (N.

12  D. Ill. 1990).

13          The court in *Paul, supra,* 123 F.R.D. 277-78, formulated the almost

14  universally accepted test for determining whether a party's expert should be

15  disqualified. Under *Paul*, a court should determine whether the moving party and the

16  expert had a relationship "which gave rise to an objectively reasonable expectation

17  [that the moving party] could, without risk, impart confidential information to" the

18  expert and whether the moving party disclosed confidential information to the expert.

19  *Id*. at 277. As a third step, courts also balance the public interest factors to determine

20  whether disqualification is fair and appropriate. *Id., see also Stencel v. Fairchild*

21  *Corp., supra,* 174 F. Supp. 2d at 1083. "[D]isqualification is not warranted where no

22  privileged or confidential information was passed." *Cherry Hill Convalescent Center,*

23  *Inc.*, 994 F. Supp. at 249; *see also Chamberlain*, 2002 WL 653893 at *3. To meet its

24  burden of proof, the moving party must "point to *specific and unambiguous*

---

26  [16] *See also Arnold*, 2004 WL 2713259 at *3 (allowing use of disqualified attorney's work product because "Cargill made no attempt to demonstrate that any of the specified materials were tainted or even reasonably likely to be tainted" with confidential information); *Actel*, 1996 WL 297045 at *12; *First Wisconsin Mortgage Trust, supra*, 584 F.2d at 208-9.

1  disclosures" of confidential information.  *See In re JDS Uniphase Corp. Securities*

2  *Litig.*, 2006 WL 2845212 at *3 (internal quotations omitted) (emphasis added).

3  "Communication based upon technical information as opposed to legal advice is not

4  considered privileged." *Hewlett Packard*, *supra*, 330 F. Supp. 2d at 1094 (quotations

5  omitted).  Moreover, documents that are in the "public record" "cannot be

6  confidential information." *Stencel*, 174 F. Supp. 2d at 1084.  Likewise, federal courts

7  have recognized that information exchanged with a *testifying* expert cannot be

8  considered confidential.  *See, e.g., Chamberlain Group*, 2002 WL 653893 at *2-3.

9            In this Motion, plaintiffs rely on the information Shaw provided to

10  DBSA Labs in 2003 as the "confidential" information justifying the disqualification

11  of NewFields.  Therefore, under *Paul*, and the *First Wisconsin* line of cases, to

12  disqualify NewFields, plaintiffs must first prove that these materials constitute

13  "confidential information," and then identify "specific and unambiguous disclosures"

14  of this information from DBSA to NewFields.  Plaintiffs can not meet their "heavy

15  standard of proof" as to either element; nor can plaintiffs show that they reasonably

16  believed they had a confidential relationship with DBSA or NewFields.  Plaintiffs

17  argue the following extended chain of events justifies NewFields' disqualification: 1)

18  Shaw had a confidential relationship with DBSA Lab; 2) Shaw passed confidential

19  information to DBSA Lab; 3) plaintiffs never waived confidentiality over that

20  information; 4) the passage of confidential information to DBSA Lab disqualified all

21  of DBSA from performing any expert consulting work for McKesson, including Dr.

22  Stephens; 5) the disqualification of DBSA tainted all work product of DBSA, whether

23  related to any alleged "confidential" information passed to DBSA Lab or not; 6)

24  NewField's use of the Geosyntec database justifies disqualification of New Fields,

25  though sourced from entirely non-confidential technical reports unrelated to

26  information passed from Shaw to DBSA Lab and causing no prejudice to plaintiffs.

27  Every single link in this chain of events is either factually inaccurate, legally

28  indefensible, or both.

1.    Plaintiffs Never Reasonably Believed They Had a Confidential Relationship with DBSA/NewFields.

Plaintiffs have never had **any** relationship with NewFields in this matter. (Edgcomb Decl. at 61). Instead, they claim a former confidential relationship between Shaw and DBSA Lab allows them, based on the non-existent per se "taint" test, to move to disqualify NewFields. However, plaintiffs' initial premise is false since they never had a confidential relationship with DBSA Lab. The law requires an "objectively reasonable expectation [that they] could, *without risk*, impart confidential information to" DBSA Lab. *Paul*, 123 F.R.D. at 277 (emphasis added). DBSA Lab was hired only to perform physical tests of soil samples to become part of the Shaw Report that plaintiffs filed with DTSC. (*See* Section II.B and C, *supra*.) When plaintiffs authorized Shaw to obtain DBSA Lab's soil analysis, they knew that the analysis would be part of a non-confidential regulatory report subject to discovery. (*See* note 3, *supra* ). Moreover, the Shaw and DBSA Lab bore no objective indicia of a "confidential" relationship. (*See* Section II.B.2, *supra*.) The failure of plaintiffs and their counsel to take steps to insure DBSA Lab understood the litigation context of the testing weighs against disqualification of that consultant. *See Malden Mills Ind., Inc. v. Commerce Indus. Ins. Co.*, 275 B.R. 670, 675 (D. Mass. 2002).

Any argument that plaintiffs had an objectively confidential relationship with *DBSA* that can be imputed to NewFields fails. *Cf. North Pacifica, LLC v. City of Pacifica*, 335 F. Supp. 2d 1045, 1053 (N.D. Cal. 2004) (rejecting disqualification argument that "require[d] imputation upon imputation to be successful.")

2.    Shaw Never Passed "Confidential" Information to DBSA Lab.

The six pages of documents passed from Shaw to DBSA Lab included solely *technical information*, no confidential legal strategies. (*See* Section II.B.2, *supra*.) Purely technical information cannot be deemed sufficiently "confidential" to justify disqualification of an expert witness. *Hewlett Packard*, *supra*, 330 F. Supp. 2d at 1094; *Malden Mills Ind.*, *supra*, 275 B.R. at 675; *Palmer*, *supra*, 144 F.R.D. at 68;

---

17

1    *Nikkal Ind., Inc. v. Salton*, 689 F. Supp. 187, 191-92 (S.D.N.Y. 1988).

2        3.    Plaintiffs Repeatedly Waived Any Confidentiality Over All
             Information Shaw Gave To DBSA Lab.
3

4            Even if plaintiffs had given confidential information to DBSA Lab, they

5    must prove they did not waive confidentiality. "[T]he burden is on the party seeking

6    disqualification to establish the existence of confidentiality *and its nonwaiver*."

     *Advanced Cardiovascular Sys. v. Medtronic, Inc.*, 1998 WL 230981 at *2 (N.D. Cal.
7
     Feb. 27, 1998) (emphasis added); *see also Crenshaw*, 318 F. Supp. 2d at 1027. Here,
8
     plaintiffs waived any confidentiality by disclosing the Shaw Report to the DTSC,
9
     designating Dr. Everett as a testifying expert, and giving Dr. Everett the Geosyntec
10
     database to use.[17] Plaintiffs' public disclosure of all information Shaw gave to DBSA
11
     Lab forecloses any claim the information is confidential. (*See* Section II.G.1 above).
12
     Also, numerous witnesses have testified that the Shaw Report was prepared and
13
     submitted to DTSC to satisfy DTSC's demands. (*See* Section II.B.1 above).
14
     Documents disclosed to the government cannot be protected from disclosure. (*See*
15
     note 3, *supra*). Judge Eick's July 6, 2006 Order held that plaintiffs waived all claims
16
     of confidentiality over the Shaw Report and related documents. Judge Eick rejected
17
     plaintiffs' objections based on Rule 26 "expert report" protection and the mediation
18
     confidentiality agreement. (*See* Section II.G.1, *supra*.)
19
             Even if the Court assumes the Shaw Report was Dr. Everett's expert
20
     report under Rule 26(a)(2)(B), all information considered, relied upon or generated by
21
     a testifying expert is non-confidential. "[P]arties cannot assert that materials provided
22
     to experts are protected from disclosure by privilege or confidentiality." *Chamberlain*
23
     *Group, Inc.*, 2002 WL 653893 at *2-3 (denying motion to disqualify expert).[18]
24

25   [17] *See* Section II.G , *supra*; *Chamberlain Group*, 2002 WL 653893 at *2-3
     (information given to testifying expert cannot form basis of motion to disqualify);
26   *Twin City Fire Ins. Co.*, *supra*, 2006 WL 5164249 at *4 (same).

27   [18] *See also Twin City Fire Ins. Co.*, 2006 WL 5164249 at *4 (information exchanged
     with testifying expert cannot form basis of motion to disqualify expert); *Hewlett-*
28                                                                  (Footnote Continued on Next Page.)

1   Plaintiffs therefore knew that all confidential information disclosed to Dr. Everett for

2   later dissemination to DBSA Lab would be discoverable.  The *Chamberlain Group*,

3   *Twin City Fire Ins. Co.*, *Hewlett-Packard*, and *Stencel* courts all recognized that

4   disqualification is inappropriate under these circumstances.

5           Moreover, since the Geosyntec database (as modified by DBSA) was

6   utilized by Dr. Everett and produced to McKesson as part of Everett's expert file (*see*

7   Section II.G.3), plaintiffs cannot now claim that data in the Geosyntec database is

8   confidential to them.  Rule 26(a)(2)(B) requires disclosure of information given to a

9   party's testifying expert, and precludes a party from arguing that such information is

10  privileged or confidential.  Again, as the *Chamberlain* court put it, "parties cannot

11  assert that materials provided to experts are protected from disclosure by privilege or

12  confidentiality." *Chamberlain Group*, 2002 WL 653893 at *2-3; *see also* note 16,

13  *supra* (citing cases).  See also *Twin City Fire Ins. Co.*, 2006 WL 5164249 at *4

14  (denying motion for failure to identify confidential information).

15      4.      DBSA Lab Knowledge Is Not Imputed To Dr. Stephens.

16          Dr. Stephens and his litigation support team performed the work on the

17  Geosyntec database had no connection with DBSA Lab testing and DBSA Labs had

18  no connection with the McKesson work, including the Geosyntec database.  (*See*

19  Section II.D, *supra*).  McKesson's contact was with Dr. Stephens himself, the founder

20  and *former* President of DBSA.  This is akin to the situation presented in *Sanderson v.

21  Boddie-Noell Enterprises, Inc.*, 227 F.R.D. 448 (E.D. Va. 2005) where the court

22  found that *ex parte* communications between an attorney *and the employer of

23  opponent's expert witness* did not violate FRCP 26(b)(4) because the employee's

24  _____

25  (Footnote Continued from Previous Page.)

26  *Packard Co., supra*, 330 F. Supp. 2d at 1097 (denying motion to disqualify because,
    *inter alia*, "subject matter of the [allegedly confidential] discussion was material
27  contained in publicly available patents."); *Stencel, supra*, 174 F. Supp. 2d at 1084
    (designation of expert "undermines Plaintiffs' claim of a confidential relationship,
28  since testifying experts must reveal the underlying sources" of their opinions).

1  knowledge could not be imputed to his employer.  In *Sanderson*, plaintiffs' counsel's

2  contact with the expert witness' employer was excused.  Here, McKesson's contact

3  with Dr. Stephens is one *more* step removed, in that Dr. Stephens was not even the

4  DBSA Lab technician's employer, but just another DBSA consultant.  *See also BP*

5  *Amoco Chem. Co. v. Flint Hills Resources, LLC*, 500 F.Supp.2d 957, 960 (N.D.Ill.,

6  2007) ("[C]ourts have refused to impute a conflict of interest on other members of an

7  expert's firm.");[19] *Stencel, supra*, 174 F. Supp. 2d at 1087.

8      5.    DBSA's Disqualification Did Not Bar McKesson From Using
9                  Geosyntec Database Updated by DBSA as "Poisonous Fruit."

10            Plaintiffs cite no legal authority for their absurdly broad proposal that

11  once a consultant is disqualified, it becomes a "poisonous tree" and that *any* work

12  performed by that consultant, whether or not related to the confidential information

13  allegedly in its possession, is *per se* tainted  "poisonous fruit" that can lead to the

14  further disqualification of other experts using it.  (*See* Section III.A, *supra*).

15  McKesson has cited the *First Wisconsin* line of cases rejecting this *per se* taint rule

16  Instead, courts have held where there was no indication of improper advantage, such

17  as the use of confidential information obtained from the opposing party, subsequent

18  use of such work product is proper and it is an abuse of the district court's discretion

19  to preclude use of that work product.[20]  Courts require *the moving party* to

20  particularly identify any of the moving party's confidential information that the

21  opposing party possesses  and reject the use of "conjecture about the potential for

22  confidential information to be exploited." *Lone Star Indust., Inc., supra,* 1995 WL

23  775348. *See also, Paul, supra,* 123 F.R.D. at 277.  After all, "[t]he movant who

24  claims that its opponent should be denied the work product because of the opponent's

[19] McKesson cited *Sanderson* and *BP Amoco Chem. Co.* as new case law supporting its recent motion for reconsideration of the Court's October 4, 2004 Order disqualifying DBSA.  (*See* RJN ¶ 18 at pp. 22-23.)
[20] *See First Wisconsin Mortg. Trust , supra,* 584 F.2d at 211, and other cases cited in Section III.A, *supra*.

1   counsel having previously also represented it should be in the best possible position to

2   point out to the district court the facets of the relationship which it had with the

3   disqualified counsel which would somehow give an improper advantage against it."

4   *First Wisconsin , supra,* 584 F.2d at 209.

5       6.      Plaintiffs' Speculation Is Inadequate to Support  Motion;
                McKesson Has Proven That NewFields Does Not Possess
6               Confidential Information.

7               Plaintiffs fail to meet their heavy burden of proof to "particularly

8   identify" *any* of their confidential information they claim to be in NewFields'

9   possession.  Plaintiffs' failure of proof  is striking and fatal to their Motion.  Plaintiffs

10  have received every document and database from NewFields they requested and have

11  deposed the NewFields and Geosyntec consultants extensively.  (*See* Edgcomb Decl.

12  ¶ 53.)  Plaintiffs' experts have scoured those materials to identify the information

13  NewFields received from DBSA or Geosyntec.  (*See, e.g.,* Wells Decl. ¶ 2.)  ***Yet,***

14  ***nowhere do plaintiffs present any evidence at all that NewFields possesses any of***

15  ***plaintiffs' confidential information.  Not a single witness, not a single document.***

16  ***Nothing.***

17              Instead, plaintiffs present page after page of evidence showing

18  (unremarkably) that NewFields experts relied on the *non-confidential* data entries and

19  regulatory reports by DBSA or Geosyntec (*see, e.g.,* Mot. at 11:14-22), hoping that

20  the mere implied suspicion that NewFields relied on some unidentified confidential

21  information will suffice.  No court has disqualified an expert based only on the

22  moving party's suspicions.  To the contrary, numerous courts have refused to

23  disqualify an expert where the moving party fails to demonstrate by direct evidence

24  that the opposing expert possesses identifiable confidential information.[21]  Since

25  _____

26  [21] *See, e.g., In re JDS Uniphase Corp. Sec. Litig.,* 2006 WL 2845212 at * 4 (rejecting
        argument that "just being privy or having access to confidential information is enough
27      to satisfy the second prong of the test"); *Cherry Hill Convalescent Ctr, Inc., supra,*
        994 F. Supp. at 250 (rejecting speculation that expert "probably obtained"
28      confidential information); *North Pacifica, LLC, supra,* 335 F. Supp. 2d at

                                    (Footnote Continued on Next Page.)

1  plaintiffs cannot identify specific and unambiguous disclosures of confidential

2  information to NewFields, they cannot disqualify NewFields.

3          In contrast, McKesson presents direct and uncontroverted evidence that

4  neither the Geosyntec database nor the partially derivative NewFields database

5  contain any of plaintiffs' alleged confidential information.  Two consultants have

6  carefully examined the DBSA entries into the Geosyntec database and testified under

7  oath that each of the entries was of non-confidential data (e.g., water levels) gleaned

8  from non-confidential sources (e.g., regulatory reports submitted to the DTSC and

9  exchanged between the parties).  (RJN ¶ 2 at 1:14-2:16; Wild Decl. ¶ 37 Section II.D,

10  *supra*.)  Thus, plaintiffs' motion must fail.

11      **C.**    **The Balance Of Equities Strongly Favors Denial.**

12      1.    Plaintiffs Not Prejudiced By NewFields' Use of the Database.

13          Since the DBSA information in the Geosyntec database is from non-

14  confidential, discoverable source reports, plaintiffs will not be prejudiced if

15  McKesson uses that data.  Courts recognize that a party is not prejudiced by an

16  opposing expert's possession of non-confidential information.[22]  The only prejudice

17  ─────────────────────

(Footnote Continued from Previous Page.)

18  1053(denying motion because moving party offered "nothing but a conclusory
19  assertion" regarding confidential information); *Twin City Fire Ins. Co., supra*, 2006
   WL 5164249 at *5 (denying motion because moving party "has not pointed to any
20  particular documents or disclosures that were privileged"); *Greene, Tweed of
   Delaware, Inc. v. DuPont Dow Elastomers, LLC*, 202 F.R.D. 426, 430 (E.D. Penn.
21  2001) ("DuPont's conclusory assertions . . . , without supporting evidence, are not
   enough to satisfy burden of showing confidentiality"); *Chamberlain Group, supra*,
22  2002 WL 653893 at *3 (party "cannot satisfy its burden to disqualify [expert] based
   on unsupported assertions"); *Coates v. Duffer's Golf Center*, 2007 WL 1289890, at *
23  1 (D. Mass. May 2, 2007) (rejecting declarant's identification of alleged confidential
   information "in general terms that litigation strategies, merits of the plaintiff's case,
24  and other strengths and weaknesses of the case were discussed"); *Harvey v. Jones*,
   2006 WL 1889314 (W.D. Wash. July 7, 2006) (confidential information not shown
25  by allegation that expert learned "plaintiff's theories regarding . . . defendant's
   potential liability and defenses as well as medical issues pertaining to [plaintiff's]
26  death"); *Endrody v. M/Y Anomaly*, 2005 WL 2207007, at *2 (W.D. Wash. Sept. 9,
   2005); *Thane Int'l, Inc.*, 2004 WL 1146587 at *4.
27  [22]  *See, e.g., Cherry Hill Convalescent Ctr, Inc.,supra*, 994 F. Supp. at 249 ("Since
   no confidential or privileged communications . . . were disclosed, [moving party]
28  will not be prejudiced by [expert's] participation in this litigation"); *Twin City Fire*

(Footnote Continued on Next Page.)

1  plaintiffs claim is an alleged potential conflict involved in offering DBSA's expert

2  opinion while also allegedly having to "develop evidence against, ask questions in

3  deposition of, and cross-examine [DBSA] at trial . . . ." (Mot. at 25:5-10.)  This claim

4  is ridiculous since neither party will offer expert testimony from DBSA.  DBSA was,

5  according to plaintiffs, a "*consulting* expert," and they *did not designate* DBSA as a

6  testifying expert in either of their expert witness disclosures.  (Mot. at 25:12;

7  Edgcomb Decl., ¶ 16, Exs. 9, 10.)  Plaintiffs' failure to designate DBSA as a

8  testifying expert precludes plaintiffs from offering any DBSA expert opinion at trial.

9  (*See* Fed. R. Civ. P. 37(c); *cf. Malden Mills Ind.*, *supra*, 275 B.R. at 675.  Moreover,

10  McKesson offered nearly four years ago (but plaintiffs refused), and offers now, to

11  stipulate to the validity of the DBSA Lab Report, so there is no need for DBSA to

12  testify about those lab results.  (RJN ¶ 7 at 44:4-7; Edgcomb Decl. ¶ 14, Ex. 8.)

13     2.    Disqualification of NewFields Would Irreparably Prejudice
       McKesson

14

15         The opinions of NewFields' experts Hall, Rouhani and Finley are

16  central to McKesson's counterclaim and defense in this action.  (*See* Edgcomb Decl.,

17  ¶ 58, Exs. 33-38) (listing opinions, attaching expert reports).  Their opinions bear on

18  the core issues of this case:  which party contaminated the McKesson and Angeles

19  sites and the extent to which appropriate steps have been taken to remediate that

20  contamination.  Their opinions, based on objective evidence culled from regulatory

21  reports and other sources, disprove plaintiffs' blame of McKesson for the

22  contamination on the Angeles site and justify an award to McKesson for plaintiffs'

23  contamination of the McKesson site.  Thus, an order depriving McKesson of these

24  (Footnote Continued from Previous Page.)

25  *Ins. Co.*, *supra*, 2006 WL 5164249 at *4 (moving party not prejudiced if expert
"received information that Twin City could obtain through discovery"); *In re JDS

26  Uniphase Corp. Securities Litig.*, 2006 WL 2845212 at *3 (moving party not
prejudiced where information opposing expert possesses "is discoverable");

27  *Hewlett-Packard*, *supra*, 330 F. Supp. 2d at 1097-98 ("At this late stage, . . . no
prejudice exists now, given the parties' extensive disclosures . . . .").

28

MCKESSON'S OPPOSITION TO PLAINTIFFS' MOTION FOR DISQUALIFICATION OF NEWFIELDS

A/72487987.1/0335440-0000317287

1  experts' opinions would be devastating and irreversibly prejudicial.

2  McKesson could not find adequate substitutes for these experts' opinions

3  without additional court-ordered relief further delaying this case extensively and

4  requiring expenditure of significantly more money to retain a new team of experts to

5  re-review the evidence and replicate this work, very conservatively estimated at

6  hundreds of thousands of dollars. (Edgcomb Decl., ¶ 59.) The need to ensure that

7  litigants have access to expert witnesses and their specialized knowledge militate

8  against disqualifying NewFields. *English Feedlot Inc. v. Norden Lab, Inc.*, 833 F.

9  Supp. 1498, 1504-05 (D. Colo. 1993). Courts are particularly reluctant to allow easy

10  disqualification of experts on the basis of relatively minor prior assignments.[23] *Paul,*

11  *supra,* 123 F.R.D. at 281-82; *Palmer,* 144 F.R.D. at 67, n.4.

12  McKesson has done nothing to warrant such an extreme penalty, one

13  granted only in "rare" cases (*Hewlett-Packard Co., supra*, 330 F. Supp. 2d at 1092).

14  As proven above, all data in the Geosyntec database and that relating to DBSA Lab's

15  work for Shaw is non-confidential. McKesson has always been entitled to rely on this

16  data to defend itself; indeed, McKesson could not defend itself *without* it. Moreover,

17  McKesson's actions have always been in good faith and consistent with the

18  applicable case law. (Edgcomb Decl., ¶ 52; RJN ¶ 2 at 2:17-22). McKesson did not

19  have reason to believe that the disqualification of DBSA precluded McKesson from

20  using a database composed of non-confidential data corrections and supplementation

21  by DBSA. Plaintiffs' motion to disqualify asked only that the Court disqualify DBSA

22  as McKesson's *expert*. The Court's Order did not require destruction or quarantine of

23  all materials to which DBSA contributed. (RJN ¶ 7 at 6:5-7.) Moreover, relevant

24  case law squarely rejects the *"per se"* taint rule, and instead requires the moving party

25  to prove that the information at issue is itself confidential. (*See* Section III.A, *supra*).

26  ───────────────

27  [23] The DBSA Lab physical testing work was a one-task effort lasting only a few
months and costing little more than $10,000. (*See* Edgcomb Decl., ¶¶ 3, 5, Exs. 1

28  and 2.)

Even now, plaintiffs cannot prove that *anything* in NewFields' possession is confidential.  Thus, McKesson's actions have been consistent with the law, good faith, and McKesson's right to defend itself with the facts.  Plaintiffs' effort to irreparably prejudice McKesson through the extreme and crippling sanction of disqualification of its most critical experts is aimed at gaining overwhelming litigation advantage over McKesson.

3.   Plaintiffs Purposefully Delayed In Bringing The Motion To Irreparably Prejudice McKesson

Plaintiffs knew since August 16, 2007 that NewFields utilized the Geosyntec database, yet *waited seven months*, until March 14, 2008, the eve of rebuttal report disclosures, to file the Motion.  (Edgcomb Decl., ¶ 60).  As a result of plaintiffs' prejudicial delay, McKesson expended significant sums on NewFields' expert document and deposition discovery and has invested in and relied on NewFields since August as its primary rebuttal expert; indeed, McKesson just disclosed three rebuttal expert reports prepared by NewFields.  Plaintiffs consciously delayed until the eve of rebuttal disclosures in an effort to deprive McKesson of the ability to present rebuttal expert testimony on the central issues in this case at trial, to its irreparable prejudice.

Respectfully submitted,

DATED:  March 31, 2008

EDGCOMB LAW GROUP

By: _John D. Edgcomb/plw_
   John D. Edgcomb
jedgcomb@edgcomb-law.com
Attorneys for McKESSON CORP.

DATED:  March 31, 2008

BINGHAM MCCUTCHEN LLP

By: _Nancy M. Wilms_
   Nancy M. Wilms
   nancy.wilms@bingham.com
   Attorneys for McKESSON CORP.

A/72487987.1/0335440-0000317287